UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO. 23-61376-lrc |
| PONTOON BREWING COMPANY, LLC, | ) | |
| | ) | CHAPTER 11 |
| Debtor | ) | |
| _____ | ) | (Subchapter V) |

FIRST AMENDED AND RESTATED
CHAPTER 11 PLAN OF REORGANIZATION SUBMITTED BY
PONTOON BREWING COMPANY, LLC,
DEBTOR AND DEBTOR IN POSSESSION

April 8, 2024

Filed by:

PONTOON BREWING COMPANY, LLC,
Debtor and Debtor in Possession

Attorneys for Debtors:
G. Frank Nason, IV
Georgia Bar No. 535160
LAMBERTH, CIFELLI,
 ELLIS & NASON, P.A.
6000 Lake Forrest Drive, NW
Suite 435
Atlanta, GA 30328
(404) 262-7373

## Introduction

Pursuant to Title 11 of the United States Code, Pontoon Brewing Company, LLC ("Debtor"), Chapter 11 debtor and debtor in possession, and pursuant to 11 U.S.C. §§ 1123, 1189, and 1190, hereby submits and proposes this *First Amended and Restated Chapter 11 Plan of Reorganization Submitted by Pontoon Brewing Company, LLC, Debtor and Debtor in Possession* (the "Plan").

## Article 1
## Subchapter V Disclosures

1.1    <u>Subchapter V Plan of Reorganization</u>. This Plan is filed under Subchapter V of Chapter 11 of the Bankruptcy Code.

1.2    <u>History of Debtor' Business Operations</u>. Debtor is a limited liability company formed in 2013. Debtor is a microbrewery that manufactures ales and lagers. Debtor has received numerous awards, including Best New Brewery in Georgia, and medals from, among others, the U.S. Beer Open, Atlanta Cask Ale Tasting,  and Beer Connoisseur.

Debtor initially operated at 8601 Dunwoody Place, Building 500, Suite 500, Sandy Springs, GA 30350 (the "Sandy Springs Location"). With its success at the Sandy Springs Location, Debtor sought expansion and in 2021 entered into a lease of premises at 4729 Stone Drive, Suite A, Tucker, Georgia 30084 (the "Tucker Location"), which would be Debtor's primary manufacturing facility. Despite the pandemic and related supply chain issues, Debtor was able to produce its product at the Tucker Location in January of 2023.

In order to grow its brand and increase its market, Debtor entered into the following agreements with Community Brewing Ventures, LLC ("CBV"): (i) *Brewing Services Agreement* (the "Brewing Agreement") pursuant to which Debtor was to brew and package CBV's proprietary beverages at the Tucker Location, and (ii) *Exclusive Brewing Agreement* (the "License Agreement") with CBV granting CBV a license to brew, package, and distribute Debtor's proprietary beverages within the United States.

Debtor brewed CBV product in accordance with the Brewing Agreement. CBV failed to hold up its end of the bargain. In particular, CBV defaulted by failing to pay for product, causing delays, and ultimately refusing to order product while simultaneously cutting off Debtor's ability to distribute product. The result was a loss of approximately 65% of revenues. Debtor is owed approximately $289,239 from CBV for product, and has claims against CBV for losses in excess of $1.5 million. Debtor is rejecting the Brewing Agreement and Licensing Agreement in order to secure distribution rights for its product.

As a result of the failure of CBV to pay for its product and its refusal to distribute Debtor's product, Debtor ceased operating in October of 2023. Debtor liquidated the equipment acquired as part of the expansion at the Tucker Location through an Auction overseen by New Mill Capital Holdings, LLC, pursuant to the *Order Approving Sale of Assets at Tucker Location*

*Free and Clear of Liens, Claims, and Encumbrances* (Doc. No. 80). Debtor has restarted its operations at the Sandy Springs Location pursuant to orders authorizing Debtor to use cash collateral for such purposes.

In 2021, Debtor's gross revenues were approximately $2,776,000. In 2022, Debtor's gross revenues were approximately $2,568,000, representing approximately $976,000 in tap room revenues, $195,000 in online sales, $862,000 in in-state distribution sales, $459,000 in out-of-state distribution sales, and $76,000 in private event sales. Debtor's assets consist primarily of distribution brewing equipment located at the Tucker Location, brewing equipment at the Sandy Springs Location, machinery, fixtures, completed beer inventory and brewing ingredients.

1.3    <u>Current Management and Insider Employees</u>. Debtor's management I currently overseen by Sean O'Keefe, who is paid $80,000 per year in salary.

1.4    <u>Liquidation Analysis</u>. Ameris Bank holds a first priority security interest in the equipment and assets at the Sandy Springs Location to secure a debt for which Ameris Bank filed a proof of claim in the amount of $245,641.60. United Community Bank holds a first priority security interest in the equipment and assets at the Tucker Location acquired as part of the expansion to secure a debt for which United Community Bank filed proofs of claim totaling $1,853,776.28. The Small Business Administration has a subordinated security interest to secure a debt for which the Small Business Administration filed a proof of claim in the amount of $820,804.59. New Mill Capital Holdings, LLC, has been employed to liquidate the assets at the Tucker Location. The liquidation value of the assets at the Tucker Location may be less than $400,000. The liquidation sale of the assets at the Sandy Springs Location  may be less than $250,000. Accordingly, in a liquidation there would be no amounts available for unsecured creditors from the liquidation of assets. The only funds available would be from recoveries of Avoidance Actions and Causes of Action. Under the Plan, Avoidance Actions and Causes of Action will be prosecuted by Debtor, with all proceeds to be distributed in accordance with Bankruptcy Code priorities. Because there will be no commissions paid to a Chapter 7 trustee, the recovery from Avoidance Actions under the Plan will produce a greater recovery for Creditors. The Plan satisfies the requirements of 11 U.S.C. § 1129(a)(7)(A) as incorporated into § 1191(a).

1.5    <u>Alternative Confirmation Standards under §1191(a) and (b)</u>. Debtor seeks to confirm this Plan by obtaining the consent of all Classes provided for in this Plan by a majority in number and two-thirds in amount of Allowed Claims actually voting. If Debtor succeeds in obtaining the consent of all Classes, the provisions of the Plan referencing and operating under § 1191(a) of the Bankruptcy Code will apply. If Debtor is unable to obtain the consent of all Classes, Debtor will request the Court to confirm the Plan under § 1191(b). In this case, the provisions of the Plan referencing and operating under § 1191(b) of the Bankruptcy Code will apply.

1.6    <u>Property and Claims</u>. The Plan deals with all the property of Debtor and provides treatment of all Allowed Claims against Debtor and its property.

## Article 2
## Definitions

Unless the context requires otherwise, the following terms shall have the respective meanings specified below whenever used in the Plan. Capitalized terms not defined in this Plan have the meanings ascribed to such terms in Title 11 of the United States Code and the Federal Rules of Bankruptcy Procedure. Accounting terms not defined in the Plan shall have the meanings ascribed to such terms in accordance with generally accepted accounting principles currently in effect. Whenever from the context it appears appropriate, terms stated in the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter.  The words "herein," "hereof," and "hereunder" and other words of similar import shall refer to this Plan as a whole, including any and all exhibits and schedules to the Plan, as the same may be amended.

"Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in § 503(b) of the Bankruptcy Code and referred to in § 507(a)(2) of the Bankruptcy Code, including, without limitation: (a) the actual, necessary costs and expenses of preserving the estate and administering the Case that arose or accrued or that shall arise or accrue in the ordinary course of business during the period between the Petition Date and the Closing Date; (b) any Professional Fee Claim; and (c) any fee or charge assessed against Debtor under 28 U.S.C. § 1930.

 "Allowed Administrative Claim" means all or that portion of an Administrative Claim to the extent it has been allowed by a Final Order of the Bankruptcy Court.

"Allowed Claim and Allowed . . . Claim" means all or that portion of any Claim, other than an Administrative Claim, against Debtor to the extent that: (a) proof of such Claim has been filed or is deemed filed pursuant to § 1111 of the Bankruptcy Code and is not the subject of an objection filed by the last date set by the Bankruptcy Court for filing objections to Claims; or (b) it has been allowed by this Plan or a Final Order of the Bankruptcy Court after objection pursuant to the procedures established in this Plan for resolution of Disputed Claims. The term "Allowed," when used to modify a reference in the Plan to any Claim or Class of Claims, shall mean a Claim (or any Claim in any such Class) that is so allowed.

"Ameris" means Ameris Bank, successor to Fidelity Bank, which filed a proof of claim in the amount of $245,641.60, secured by a security interest in equipment, inventory, chattel paper, accounts, and other property as reflected in its loan documents and a UCC-1 financing statement at 0602017-2823, Fulton County Records, recorded on April 11, 2017, as continued by a Continuation Statement at 0602022-001384, Fulton County Records, recorded on March 10, 2022.

"Auction" shall mean the auction of equipment at the Tucker Location conducted by New Mill Capital, LLC, pursuant to the *Order Approving Sale of Assets at Tucker Location Free and Clear of Liens, Claims, and Encumbrances* (Doc. No. 80).

3

"Avoidance Action" means any claim or right arising out of or maintainable pursuant to §§510, 544, 545, 546, 547, 548, 549, 550 or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether any action to assert such claim or right has been commenced or asserted prior to the Effective Date.

"Bankruptcy Code" means Title 11 of the United States Code, as amended, as applicable to the Bankruptcy Case.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as applicable from time to time to the Case.

"Business Day" means a day on which commercial banks in Georgia are not required or authorized by law to be closed.

"Brewing Agreements" means the (i) *Brewing Services Agreement* with CBV pursuant to which Debtor was to brew and package CBV's proprietary beverages at the Tucker Location, and (ii) *Exclusive Brewing Agreement* with CBV granting CBV a license to brew, package, and distribute Debtor's proprietary beverages within the United States.

"Case" means Debtor's Chapter 11 bankruptcy case.

"Cash" means lawful currency of the United States and its equivalents, provided, however, that any distributions under this Plan will be deemed to be made in Cash if made by check drawn on any United States bank, or by wire transfer.

"Causes of Action" means all claims, rights, remedies, or other relief against third parties available or belonging to Debtor, other than Avoidance Actions. Causes of Action include all claims that Debtor may have against CBV.

"CBV" means Community Brewing Ventures, LLC.

"Claim" means a claim, as defined in § 101(5) of the Bankruptcy Code, against Debtor.

"Claims Bar Date" means: (a) with respect to Administrative Claims (other than Professional Fee Claims) that accrued or were incurred during the period commencing after the Petition Date but prior to the Confirmation Date, the first Business Day that is thirty (30) days after the Effective Date, and (b) with respect to a General Unsecured Claim, January 25, 2024.

"Class" means a class of Claims as defined in this Plan.

"Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order.

"Confirmation Hearing" means the duly noticed hearing held by the Bankruptcy Court pursuant to § 1128 of the Bankruptcy Code to consider confirmation of this Plan, as may be adjourned by the Court from time to time without further notice other than announcement of the adjourned date of the Confirmation Hearing at such hearing.

"Confirmation Order" means the order of the Bankruptcy Court confirming this Plan.

"Court" means the Bankruptcy Court or any other Court of the United States with authority over the Case or, with respect to any particular proceeding arising under or related to the Case, any other Court that is exercising jurisdiction over such proceeding.

"Creditor" means the Holder of a Claim against Debtor.

"Debtor" means Pontoon Brewing Company, LLC.

"Debtor's Counsel" means Lamberth, Cifelli, Ellis & Nason, P.A.

"Designated Notice" means notice and an opportunity for a hearing as described in § 102(a) of the Bankruptcy Code. Following entry of the Confirmation Order, the time for the giving of any notice shall be reduced to twenty (20) days, and notice shall be limited to the Notice Parties. When a party gives Designated Notice and no written objection is served within 20 Business Days of service, the party to whom Designated Notice is given shall be presumed to have consented to or have no opposition to the relief or request identified in the Designated Notice. If a timely objection is served, the Court will hold a hearing on the objection on no less than five (5) days' notice.

"Disputed Claim or Disputed . . . Claim" means a Claim that (a) is not an Allowed Claim or (b) is the subject of an objection and that has not been allowed or disallowed by a Final Order.

"Distribution" means a distribution of Cash to a Claimant on account of an Allowed Claim pursuant to the terms of this Plan.

"Distribution Date" means any date on which distributions of Cash are to be made from the Distribution Fund.

"Effective Date" means the first day that is fourteen (14) Business Days after the Confirmation Date.

"Equity Holders" means the current Holders of membership interests in Debtor on the Petition Date as set forth on attached Exhibit "A."

"Final Decree" means a Final Order of the Bankruptcy Court closing the Case.

"Final Order" means an order or judgment of a Court (including one approving a settlement) s entered on the docket which: (a) shall not have been reversed, stayed, modified or amended and as to which the time to appeal from, or to seek review or rehearing of, shall have

expired and as to which no appeal or petition for review, rehearing or certiorari is pending; or (b) if appealed from, shall have been affirmed (or the appeal dismissed) and the time to appeal from such affirmance or to seek review or rehearing thereof shall have expired, or no further hearing, appeal or petition for certiorari can be taken or granted.

"Fulton County" shall mean the Fulton County Tax Commissioner, which filed a proof of claim in the amount of $23,810.27, secured by a property tax lien against the tangible assets at the Sandy Springs Location.

"General Unsecured Claim" means a Claim against the Debtor arising on or before the Petition Date that is not an Allowed Secured Claim, Administrative Claim or Priority Tax Claim.

"GM Financial" means Americredit Financial Services, Inc. dba GM Financial.

"Holder" means the beneficial owner of any Claim.

"Insurance Proceeds" means the proceeds relating to prepetition losses of revenue involving certain equipment at the Tucker Location in the amount of $141,910.24

"IRS" means the Internal Revenue Service.

"Lien" means any mortgage, lien, pledge, charge, security interest, encumbrance or other legally cognizable security device of any kind affecting or attaching to property of the estate.

"Notice Parties" means (i) with respect to notices served Debtor, the U.S. Trustee, the Subchapter V Trustee (unless terminated in accordance with § 1183(c) of the Bankruptcy Code), and all other parties in interest who, after entry of the Confirmation Order, have filed a request for notice with the Clerk of the Court and have served same on Debtor's counsel, or (ii) with respect to notices served by a party other than Debtor, Debtor and its counsel, the U.S. Trustee, the Subchapter V Trustee (unless terminated in accordance with § 1183(c) of the Bankruptcy Code), and all other parties in interest who, after entry of the Confirmation Order, have filed a request for notice with the Clerk of the Court and have served same on Debtor's counsel.

"Petition Date" means November 16, 2023.

"Plan" means this plan proposed by Debtor, as it may be amended or modified from time to time, including all exhibits and reports annexed hereto or referenced herein.

"Post-Confirmation Administrative Claims" means costs and expenses incurred, after the Confirmation Date, in connection with administration and consummation of this Plan, including, without limitation, Post-Confirmation Professional Fee Claims.

"Post-Confirmation Professional Fee Claims" means Post-Confirmation Administrative Claims for compensation earned, and reimbursement of expenses incurred, by attorneys, accountants, or other professionals employed by Reorganized Debtor.

"Priority Tax Claim" means a Claim that is entitled to priority under § 507(a)(8) of the Bankruptcy Code.

"Professional Fee Claims" means Claims for compensation earned and reimbursement of expenses of attorneys, accountants, or other professionals employed by Debtor, with approval of the Bankruptcy Court.

"Reorganized Debtor" means Debtor from and after entry of the Confirmation Order.

"Sandy Springs Landlord" means TDC Northridge, LLC, which Debtor scheduled as holding a prepetition Claim under the Sandy Springs Lease in the amount of $93,948.25.

"Sandy Springs Lease" means the lease dated April 4, 2017, as amended by a First Amendment to Lease dated October 19, 2017, and a Second Amendment to Lease dated September 30, 2020, pursuant to which Debtor leases the Sandy Springs Location.

"Sandy Springs Location" means the operations and tap room located at 8601 Dunwoody Place, Building 500, Suite 500, Sandy Springs, GA 30350

"SBA" means the Small Business Administration, which filed a proof of claim in the amount of $820,804.59, secured by a security interest in equipment, inventory, chattel paper, accounts, and other property as reflected in its loan documents and a UCC-1 financing statement at 038-2020-030320, Coweta County Records, recorded on June 23, 2020.

"Schedules" means the schedules of assets and liabilities and any amendments thereto filed by Debtor in accordance with § 521 of the Bankruptcy Code.

"Subchapter V Trustee" means Tamara M. Ogier, the duly appointed trustee pursuant to § 1183(a) of the Bankruptcy Code.

"Toyota" means Toyota Industries Commercial Finance, Inc.

"Tucker Landlord" means Bridges-Stone Properties, LLC.

"Tucker Lease" means the lease dated March 12, 2021, pursuant to which Debtor leased the Tucker Location.

"Tucker Location" means the facility located at 4729 Stone Drive, Suite A, Tucker, Georgia 30084.

"UCB" means United Community Bank, which filed (i) a proof of claim in the amount of $1,637,697.34, secured by a security interest in equipment as reflected in its loan documents and UCC-1 financing statements at 038-2022-006820, Coweta County Records, recorded on February 24, 2022, 038-2022-016898, Coweta County Records, recorded on May 11, 2022, and 038-2022-024622, Coweta County Records, recorded on July 27, 2022, and 0602020-8638, Fulton County Records, recorded on December 30, 2020 (ii) a proof of claim in the amount of

$216,078.94, secured by a security interest in equipment as reflected in its loan documents and the UCC-1 financing statements identified herein.

"Unclaimed Property" means any funds payable to Holders of Claims that are unclaimed. Unclaimed Property shall include (a) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address, (b) funds for checks which have not been presented and paid within ninety (90) days of their issuance, and (c) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a proper address to mail or deliver such property.

"Unpaid Claims Reserve" means the reserve created pursuant to Section 6.5 of the Plan.

"U.S. Trustee" means the United States Trustee for Region 21, and the office of such United States Trustee.

### Article III
### Treatment of Unclassified Claims;
### Treatment of Executory Contracts and Unexpired Leases

Pursuant to § 1122 of the Bankruptcy Code, certain Claims are unclassified. Unclassified Claims are treated as follows:

3.1     Administrative Claims. Allowed Administrative Claims are not classified in this Plan and are treated as follows:

(a)     Payment of Allowed Administrative Claims. Holders of Allowed Administrative Claims other than Professional Fee Claims will be paid in full in cash as soon as practicable after the later of the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless otherwise agreed to by the Holder thereof. Other than Professional Fee Claims, which may be filed at any time prior to entry of a Final Decree, any request for payment of an Administrative Claim arising on or before the Confirmation Date must be filed no later than the Claims Bar Date or such Administrative Claim will be forever barred. Debtor shall have the right to object to the allowance of any Administrative Claim. Administrative Claims shall include the postpetition rent due and owing the Tucker Landlord at the rate provided in the Tucker Lease for December 2023 and January through March 2024, plus the stub rent for the period from the Petition Date through November 30, 2023, offset by any amounts paid the Tucker Landlord from the sale proceeds from the sale of the assets at the Tucker Location pursuant to 11 U.S.C. § 506(c) as agreed by UCB or as ordered by the Bankruptcy Court.

(b)     Payment of Professional Fee Claims. Professional Fee Claims with regard to the period prior to entry of the Confirmation Order shall be paid in the amount awarded pursuant to orders of the Bankruptcy Court and shall be paid in full in Cash as soon as practicable after the later of the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless otherwise agreed to by

the Holder thereof. Debtor's counsel holds an unused retainer in the amount of $15,000 and anticipates a Professional Fee Claim in the approximate amount of $40,000- $45,000.

(c)    <u>Compensation of Subchapter V Trustee</u>. The Subchapter V Trustee shall be entitled to apply for reasonable compensation for the Subchapter V Trustee's fees and expenses under 11 U.S.C. §§ 330 and 503(b)(3). Beginning in September of 2023, Debtor transferred to the Subchapter V Trustee the sum of $1,000 per month to be applied against allowed Subchapter V Trustee's fees. Debtor shall pay any unpaid portion of allowed compensation owed to the Subchapter V Trustee in full on the day after the order on the Subchapter V Trustee's application for compensation becomes a Final Order, or upon such other terms as may be agreed upon by Debtor and the Subchapter V Trustee.

3.2    <u>Priority Tax Claims</u>. Debtor is a limited liability company whose income tax attributes flow through to its member. The Georgia Department of Revenue filed a proof of claim for alcohol sales and use taxes in the amount of $2,690.35. Debtor scheduled a Claim owed the Alcohol and Tobacco Tax and Trade Bureau in the amount of $50,000, which may be disputed. The Priority Tax Claims shall accrue interest at the rate of seven percent (10%) per annum in accordance with Section 511 of the Bankruptcy Code, and be payable in equal monthly installments in the approximate amount of $1,416.00 beginning on the first Business Day that is thirty (30) days after the Effective Date and continuing on a like day of each month thereafter, calculated so that the final payment will be due no later than January 15, 2028.

3.3    <u>Treatment of Other Certain Unclassified Claims</u>. Other unclassified Claims are treated as follows:

(a)    <u>Post-Confirmation Administrative Claims</u>. Post-Confirmation Administrative Claims, other than Post-Confirmation Professional Fee Claims, shall be paid as the same come due, without the necessity of Bankruptcy Court approval. Upon motion of any party in interest, the Bankruptcy Court may review any payment of such Post-Confirmation Administrative Claims and, if appropriate, order the return or refund of any such payment. Post-Confirmation Professional Fee Claims shall be subject to review by the Notice Parties. A party seeking payment of a Post-Confirmation Professional Fee Claim shall serve its invoice on the Notice Parties. Unless one or more of the Notice Parties files an objection with the Bankruptcy Court within fourteen (14) days of the receipt of the invoice, Debtor shall be fully authorized without an order of the Bankruptcy Court to pay one hundred percent (100%) of the fees and one hundred percent (100%) of the expenses incurred. If an objection is filed, then Debtor shall still be fully authorized without an order of the Bankruptcy Court to pay one hundred percent (100%) of the fees and one hundred percent (100%) of the expenses incurred that are not the subject of an objection. The Bankruptcy Court shall retain jurisdiction over any objections to such fees and expenses that are filed and shall be authorized to determine whether to allow any disputed Post-Confirmation

Professional Fee Claims following a hearing on no less than ten (10) days' notice to the parties to the dispute.

3.4     Treatment of Executory Contracts and Unexpired Leases. Pursuant to the *Order Approving Rejection of Lease of Tucker Location* (Doc. No. 100), the Tucker Lease was rejected effective March 31, 2024. Pursuant to the *Order Approving Rejection of Brewing Agreements* (Doc. No. 99), and the Brewing Agreements effective February 21, 2024. Confirmation of the Plan shall operate to reject the license and sponsorship agreement between Debtor and DBH Gwinnett, LLC.

Confirmation of the Plan shall operate as an assumption of the Sandy Springs Lease under such terms and conditions as agreed to by the Sandy Springs Landlord or as ordered by the Court.

Confirmation of the Plan shall operate as an assumption of the lease agreements with Toyota for the 2022 Toyota forklift model #8HBW23-60934 and 2022 Aichi Scissor Lift model #SV2632E-811936. Debtor shall cure any monetary defaults under such leases on or before the Effective Date. In the event of default, Toyota shall have such rights as provided under the lease agreements and applicable law.

**Article IV**
**Classification and Treatment of Claims and Interests; Impairment**

Claims are treated as set forth below.  A Claim shall be deemed classified in a particular Class only to the extent that (a) the Claim is included within the description of that Class, and (b) the Claim is not included in any other Class.  To the extent that any portion or remainder of the Claim qualifies within the description of a different Class, that portion of the Claim shall be classified in that different Class.  A Claim is classified in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been satisfied, disallowed or extinguished before the Effective Date of the Plan.

4.1     General Provisions Regarding Secured Claims. Following Confirmation, and except as otherwise provided in the Plan, each Creditor with a Lien against property of the estate shall retain such Lien in the same priority and to the extent such Lien was valid and enforceable as of the Petition Date. Nothing herein shall be deemed a waiver of the right of Debtor or any Claimant to object to or dispute the extent and validity of any Lien. Debtor reserves the right to prepay any Allowed Secured Claim, so long as any repayment does not adversely affect the amount of disposable income payable to General Unsecured Creditors.

4.2     Class 1A (Ameris). Class 1A shall consist of the Allowed Secured Claim of the Ameris, which holds a first priority Lien on, among other assets, Debtor's equipment and assets at the Sandy Springs Location to secure a debt for which the SBA filed a Proof of Claim in the amount of $245,641.60 (the "Ameris Debt"). The Ameris Debt shall accrue interest at the rate of 8.5% and be amortized and paid over ten (10) years from the Effective Date as follows: Beginning on the first day of the first full month following the Effective Date and continuing on a like day of every month thereafter until paid in full, Debtor shall make installment payments to

Ameris in the approximate amount of $3,038.00.  In the event of default under the Plan, Ameris may provide Designated Notice of such default to the Notice Parties, and if such default is not cured within fourteen (14) Business Days of the service of the Designated Notice, Ameris will be authorized to exercise its rights under the loan documents and applicable nonbankruptcy law.

     4.3    <u>Class 1B (UCB)</u>.  Class 1B shall consist of the Allowed Claim of UCB, which filed (i) a proof of claim in the amount of $1,637,697.34, secured by a security interest in equipment as reflected in its loan documents and UCC-1 financing statements at 038-2022-006820, Coweta County Records, recorded on February 24, 2022, 038-2022-016898, Coweta County Records, recorded on May 11, 2022, and 038-2022-024622, Coweta County Records, recorded on July 27, 2022, and 0602020-8638, Fulton County Records, recorded on December 30, 2020 (ii) a proof of claim in the amount of $216,078.94, secured by a security interest in equipment as reflected in its loan documents and the UCC-1 financing statements identified herein. On the Effective Date, the net proceeds (after costs of sale and commissions owing New Mill Capital Holdings, LLC)  from the Auction shall be paid to UCB for application to its debt.

     UCB shall have an Allowed Secured Claim in the amount of $200,000 (the "UCB Secured Debt"). The UCB Secured Claim shall be secured by a security interest in Debtor's assets to the extent and in the priority as such security interest existed as of the Petition Date. The UCB Secured Debt shall accrue interest at the rate of 8.5% and be amortized and paid over eight (8) years from the Effective Date as follows: Beginning on the first day of the first full month following the Effective Date and continuing on a like day of every month thereafter until paid in full, Debtor shall make installment payments to UCB in the approximate amount of $2,873.00.  In the event of default under the Plan, UCB may provide Designated Notice of such default to the Notice Parties, and if such default is not cured within fourteen (14) Business Days of the service of the Designated Notice, UCB will be authorized to exercise its rights under the loan documents and applicable nonbankruptcy law.

     To the extent the Plan does not modify specific obligations of Debtor under its loan documents with UCB, such obligations will remain in full force and effect and continue to be enforceable in the same manner, and to the same extent, as existed on the Petition Date.

     4.4    <u>Class 1C (Fulton County)</u>. Class 1C shall consist of the Allowed Claim of Fulton County, which filed a proof of claim in the amount of $23,810.27 (the "Fulton County Debt"), secured by a property tax lien against the tangible assets at the Sandy Springs Location. The Fulton County Debt shall accrue interest at the rate of 8.5% and be amortized and paid over five (5) years from the Effective Date as follows: Beginning on the first day of the first full month following the Effective Date and continuing on a like day of every month thereafter until paid in full, Debtor shall make installment payments to Fulton County in the approximate amount of $488.00.  In the event of default under the Plan, Fulton County may provide Designated Notice of such default to the Notice Parties, and if such default is not cured within fourteen (14) Business Days of the service of the Designated Notice, Fulton County will be authorized to exercise its rights under applicable nonbankruptcy law.

     4.5    <u>Class 1D (GM Financial)</u>. Class 1D shall consist of the Allowed Claim of GM Financial in the approximate amount of $11,639.65 secured by a security interest in a 2020

Chevrolet Silverado. From and after confirmation, Debtor shall pay to GM Financial the monthly installments in the amount of $352.82 due under the loan documents as and when the same come due. Beginning on the Effective Date, Debtor shall cure the arrearages owed GM Financial in the amount of $2,100.28 in four (4) monthly installments in the amount of $527.57 each. In the event of default under the Plan, GM Financial may provide Designated Notice of such default to the Notice Parties, and if such default is not cured within fourteen (14) Business Days of the service of the Designated Notice, GM Financial will be authorized to exercise its rights under the loan documents and applicable nonbankruptcy law.

4.6    <u>Class 2 (General Unsecured Creditor)</u> Class 2 shall consist of all Allowed General Unsecured Claims. Because there is no value to any Lien asserted by the SBA on account of its subordinated position to UCB, the SBA is included in Class 2. Beginning January 15, 2025, and continuing on January 15, 2026, January 15, 2027, and January 15, 2028, Holders of Allowed Class 2 General Unsecured Claims shall receive a Pro Rata share of Debtor's projected disposable income for the prior year as set forth on attached Exhibit "C" (the "PDI").

<u>Distributions from Litigation Fund</u>. In addition to the disbursements from the PDI Fund, the Holders of Allowed Class 2 Claims shall be receive a Pro Rata share of the funds in the Litigation Fund in accordance with Article 6.4 below.

4.7    <u>Class 2.1 (Priority Claimants)</u>. Class 2.1 shall consist of the two Holders of priority claims under 11 U.S.C. § 507(a)(7): Dustin Goodman ($2,742.62) and Pisharmon Pintavorn ($2,655). Class 2.1 Creditors shall be paid the amount of their Allowed Claims on the Effective Date.

4.8    <u>Class 3 (Equity Holders)</u>. Class 3 shall consist of the Equity Holders, who are impaired as a result of dilution of their interests as a result of the Equity Contribution (defined below).

4.7    <u>Impairment</u>. All Classes are impaired and eligible to vote.

**Article V**
**Means for Execution of the Plan**

5.1    <u>Equity Contribution</u>. Debtor has secured $350,000 in Equity Contributions, which will be available for payment of Allowed Administrative Expenses due on the Effective Date of the Plan and necessary repairs, including the Glycol replacement and Augur repair. Attached as Exhibit "B" is the dilution of existing Equity Holders as a result of the Equity Contribution.

5.2    <u>Funding of the Plan</u>. Funds for payments under the Plan will be from (i) the Equity Contribution, (ii) revenues generated by the operation of Debtor's Business, and (iii) net proceeds from the prosecution and collection of Avoidance Actions and Causes of Action.

5.2    <u>Property of the Estate</u>. Property of the estate shall remain in control of Debtor and shall be free and clear of Liens, except as otherwise provided in Article 4 of the Plan. Confirmation of the Plan shall divest all Creditors of all Liens not specifically preserved herein.

5.3     Authorizations. The entry of the Confirmation Order shall constitute authorization of Debtor to take or cause to be taken any action necessary or appropriate to consummate the provisions of this Plan, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.

5.4     Objections to Claims. Any Creditor may file an objection to a Claim no later than fourteen (14) days after the Effective Date (the "Objecting Deadline"). After the Objecting Deadline, only Debtor may file objections to Claims (whether filed, scheduled, or otherwise considered). Debtor may file objections no later than ninety (90) days after the Effective Date. All objections shall be resolved by the Bankruptcy Court unless settled as provided herein. Any objection to a Claim may be settled after the settling parties provide Designated Notice of the proposed settlement and there are no timely objections, and such Claim shall become an Allowed Claim without (i) further notice to any parties, and (ii) without the approval of the Bankruptcy Court. In the event of an objection, the Bankruptcy Court shall resolve the objection after notice and hearing.

5.5     Setoff Rights.  Debtor may, but shall not be required to, setoff against any Claim, to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever which Debtor may have against the Holder of such Allowed Claim, but neither the failure to do so nor the allowance of any Allowed Claim hereunder shall constitute a waiver or release of any such claim Debtor may have against such Holder. Nothing herein shall be construed to extend any statute of limitations provided by applicable law or to prevent Debtor from filing an action.

5.6     Avoidance Actions and Causes of Action. Debtor reserves the right to pursue Avoidance Actions against any party, including the parties identified in response to Question 3 of the Statement of Financial Affairs and any other party receiving, either directly or indirectly, any transfer from Debtor recoverable under Chapter 5 of the Bankruptcy Code. Debtor reserves all rights to pursue any Causes of Action. The Net Proceeds, after payment of any contingency fees and expenses of Professionals employed to prosecute or assist in the prosecution of Avoidance Actions and Causes of Action shall be paid to the Litigation Fund for Distribution as set forth in Article 6.4

5.7     Employment of Professionals. Debtor may employ the professionals employed by Debtor prior to the Confirmation Date. Debtor shall be entitled to employ such additional professionals as may be necessary after the Confirmation Date.

5.8     Subchapter V Trustee. The Subchapter V Trustee was appointed by the U. S. Trustee in this case to perform the duties described in section 1183(b) of the Bankruptcy Code, one of which is to facilitate the development of a consensual plan of reorganization. The services of the Subchapter V Trustee shall terminate upon "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code. Debtor shall directly make all payments required under this Plan, including the first payments required for substantial consummation of the Plan.

**Article VI**
**Distributions**

6.1  <u>Distributions</u>.  Unless otherwise provided for herein, all Distributions under this Plan shall be made by Debtor.

6.2  <u>Distributions of Cash</u>. Any Distribution of Cash made by Debtor pursuant to this Plan shall, at Debtor's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank or in any other form of cash or cash equivalent.

6.3  <u>Litigation Fund</u>. Debtor shall establish one or more segregated escrow accounts to be known and designated as the Litigation Fund and shall deposit in said account(s) all proceeds from Avoidance Actions. The funds in the Litigation Fund shall be held in escrow for the sole and exclusive benefit of those parties entitled to Distributions therefrom. The Litigation Fund may from time to time be invested in short term certificates of deposit, short term treasury bills, or money market accounts, provided that such deposits or investments comply with the requirements of 11 U.S.C. § 345. All interest earned shall be retained in the Litigation Fund. Debtor shall be authorized to open such bank or other depository account or accounts as may be necessary or appropriate to carry out the provisions of the Plan.

6.4  <u>Distributions from the Litigation Fund.</u> Funds in the Litigation Fund shall be distributed as follows:

(9)  First, to pay (or to make a reasonable reserve for payment of) any and all unpaid Allowed Administrative Expense Claims or Post-Confirmation Administrative Expense Claims, including Professional Fee Claims and Post-Confirmation Professional Fee Claims;

(2)  Second, to pay (or make a reasonable reserve for payment of) any and all unpaid Priority Tax Claims until such Priority Tax Claims are paid in full, with interest as provided in Article 3.2;

(3)  Third to pay the Holders of Allowed Class 2 General Unsecured Claims each Holder's Pro Rata share of the funds remaining in the Litigation Fund.

When calculating Distributions, Debtor shall make reasonable reserves for Post-Confirmation Administrative Claims arising as a result of and in connection with (i) making the Distribution, and (ii) administering and closing the Case.

6.5  <u>No Interest on Claims or Interests</u>. Unless otherwise specifically provided for in this Plan, the Confirmation Order, no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim. Additionally, and without limiting the foregoing, interest shall not

accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final determination is made when and if such Disputed Claim becomes an Allowed Claim.

6.6    <u>Delivery of Distributions</u>. The Distribution to a Holder of an Allowed Claim shall be made by Debtor (a) at the address set forth on the Proof of Claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to Debtor after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Debtor has not received a written notice of a change of address, or (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to Debtor's books and records.

6.7    <u>Unclaimed Property</u>.  Unclaimed Property is treated as follows:

(9)    Unclaimed Property shall be deposited in the Unpaid Claims Reserve to be held in trust for the benefit of the Holders of Allowed Claims entitled thereto under the terms of the Plan.  For a period of ninety (90) days after a Distribution is made to a Creditor on account of which Unclaimed Property first results (said period being hereinafter referred to as the "Claiming Period"), Unclaimed Property shall be held in the Unpaid Claims Reserve solely for the benefit of the Holders of Allowed Claims which have failed to claim such property. During the Claiming Period, Unclaimed Property due the Holder of an Allowed Claim shall be released from the Unpaid Claims Reserve and delivered to such Holder upon presentation of proper proof by such Holder of its entitlement thereto. In the event that there is Unclaimed Property in the Unpaid Claims Reserve with regard to any Claim, Debtor shall, until such Unclaimed Property is claimed or the Claiming Period with regard to the Holder of such Claim has expired, make all subsequent Distributions due with regard to such Claim to the Unpaid Claims Reserve.  After the Claiming Period with regard to such Holder has expired, no subsequent Distributions shall be made on account of such Claim, and such Claim shall be treated as being disallowed, waived, and satisfied.

(b)    At the end of the Claiming Period, the Holder of an Allowed Claim theretofore entitled to Unclaimed Property shall cease to be entitled thereto.

(c)    The Unpaid Claims Reserve may be maintained in an interest bearing account. No Holder entitled to funds from the Unpaid Claims Reserve shall be entitled to interest with regard to the amounts due.

6.8    <u>Disputed Claims.</u>  In the event that an objection to a Claim is pending so that the Claim is a Disputed Claim, Debtor shall not make any Distributions on account of such Claim until the Claim is an Allowed Claim. Once a Disputed Claim becomes an Allowed Claim, Debtor shall pay on account of such Allowed Claim all Distributions to which such Allowed Claim would have been entitled had the Claim been an Allowed Claim when such Distributions were payable.

6.9     <u>Fractional Dollars</u>. Any other provision of this Plan notwithstanding, Debtor shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, at Debtor's option the actual payment may reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

6.8     <u>De Minimis Payments</u>.  Reorganized Debtor will not issue payments under this Plan on account of any Claim for which the Distribution would equal $15.00 or less.

**Article VII**
**Implementation of the Plan**

7.1     <u>Revesting of Assets</u>. All of the property of the estate shall vest with Debtor on the Effective Date free and clear of Liens, except as specifically provided herein.

7.2     <u>Joint and Several Liability</u>.  Confirmation of the Plan shall not affect the joint and several liability of any co-defendant, co-obligor, guarantor, or other entity that may be liable with Debtor, and such liability shall continue unabated to the extent of applicable non-bankruptcy law. Nothing herein shall be deemed to affect any right of subrogation to which any guarantor may be entitled under applicable non-bankruptcy law.

7.3     <u>Temporary Injunction</u>. The Confirmation Order shall operate as an injunction against any acts against Debtor and its property to initiate, prosecute, enforce, liquidate, collect or otherwise assert any Claim against Debtor and its property except as provided in this Plan. Any act in violation of this provision shall be null and void.

**Article VIII**
**Effect of Confirmation; Discharge**

8.1     <u>Effect of Confirmation; Continuation of Stay</u>. Except as otherwise provided in the Plan or in the Confirmation Order, this Plan upon entry of the Confirmation Order shall be binding on all parties in interest, regardless of whether the Claims are impaired and regardless of whether the Holders have accepted the Plan.

8.2     <u>Discharge</u>.

(a)     <u>Discharge if Plan Confirmed Under Section 1191(a).</u> Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, the Distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release of all Claims and Causes of Action against Debtor, whether known or unknown, including any and all liabilities of Debtor, Liens on Debtor's assets, obligations of Debtor, rights against Debtor, and Interests in Debtor or its Estate that arose prior to the Effective Date regardless of whether a claimant accepted or rejected the Plan.

(b)    <u>Discharge if Plan Confirmed Under Section 1191(b).</u> If the Plan is confirmed under section 1191(b), as soon as practicable after completion by  Debtor of the payment of all projected disposable income and any other payments expressly provided for under this Plan due within five (5) years from the Effective Date, or as the Court may fix within the Confirmation Order, the Court shall grant Debtor a discharge of all debts.

8.3    <u>Exculpation and Limitation of Liability</u>. Under the Plan, Debtor's current and/or pre-Effective Date employees, advisors, attorneys, representatives, or agents and any of such parties' successors and assigns, shall not have or incur, and shall be released from, any claim, obligation, cause of action, or liability to one another or to any Holder of any Claim or Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisor, attorney, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Bankruptcy Case, the negotiation and filing of the Plan, the filing of the Bankruptcy Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, except for their willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. No Holder of any Claim or Interest, or other party in interest, none of their respective agents, employees, representatives, financial advisors, or Affiliates, and no successors or assigns of the foregoing, shall have any right of action against the parties listed in this provision for any act or omission in connection with, relating to, or arising out of the Bankruptcy Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan. Nothing herein shall supersede, contradict, or otherwise affect the provisions of Article 7.2 of the Plan or the obligations and liabilities of any co-defendant, co-obligor, guarantor, or other entity that may be liable with Debtor. Fees and expenses which Debtor owes to its Professionals and to the SubChapter V Trustee are excluded from this Exculpation.

**Article IX**
**Retention of Jurisdiction**

9.1    Notwithstanding confirmation of this Plan or the Effective Date having occurred, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(9)    The determination of the allowability of Claims upon objection to such Claims by any party;

(9)    Determination of any objections to requests for payment of Administrative Claims, including Professional Fee Claims;

(9)    Resolution of controversies and disputes regarding the interpretation and implementation of this Plan, including the determination of defaults under the Plan;

(9)    Implementation of the provisions of this Plan and entry of orders in aid of confirmation of this Plan;

(e)     Determination of any tax liabilities pursuant to Section 505 of the Bankruptcy Code.

9.2     In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then such matter shall be heard and determined by the District Court for the Northern District of Georgia (the "District Court"). If the District Court does not have jurisdiction, then the matter may be brought before any Court having jurisdiction with regard thereto.

9.3     <u>Final Decree</u>. If the Plan is confirmed under 1191(a), the Bankruptcy Court may, upon application of Debtor, at any time after "substantial consummation" of the Plan as defined in section 1101(2) of the Bankruptcy Code, enter a final decree in the case, notwithstanding the fact that additional funds may eventually be distributed to parties in interest. In such event, the Bankruptcy Court may enter an Order closing these case pursuant to section 350 of the Bankruptcy Code, provided, however, that: (a) Debtor shall continue to have the rights, powers, and duties set forth in this Plan; (b) any provision of this Plan requiring the absence of an objection shall no longer be required, except as otherwise ordered by the Bankruptcy Court; and (c) the Bankruptcy Court may from time to time reopen the Bankruptcy Case if appropriate for any of the following purposes: (1) administering assets; (2) entertaining any adversary proceedings, contested matters or applications Debtor has brought or brings with regard to administering the Plan; (3) enforcing or interpreting this Plan or supervising its implementation; or (4) for other cause. If the Plan is confirmed under 1191(b), the Bankruptcy Court may, upon application of Debtor, at any time after completion of Plan payments, enter a final decree in the case, notwithstanding the fact that additional funds may eventually be distributed to parties in interest.

## Article X
## Modification of the Plan

Debtor shall be allowed to modify this Plan pursuant to section 1193 of the Bankruptcy Code to the extent applicable law permits. Debtor may modify the Plan at any time before the Confirmation Hearing by filing the modification with the Court. Debtor may modify the Plan upon a showing that circumstances warrant such a modification and after a notice and hearing. If the Plan was confirmed under section 1191(a), any holder of a claim or interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the plan as modified, unless, within the time fixed by the Court, such holder changes its previous acceptance or rejection. If the Plan has been confirmed under section 1191(b), Debtor may modify the Plan upon a showing the circumstances warrant such a modification and after a notice and hearing.

## Article XI
## Tax Consequences

Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and Interests, or within each Class. Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local, and foreign tax statutes. Because of the various tax issues involved, the differences

in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only. No specific tax consequences to any Creditor or Holder of an Interest are represented, implied, or warranted. Each Holder of a Claim or Interest should seek professional tax advice, including the evaluation of recently enacted or pending legislation, because recent changes in taxation may be complex and lack authoritative interpretation. DEBTOR ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONSUMMATION OF THE PLAN WILL HAVE ON ANY GIVEN HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

**Article XII**
**Request for Confirmation Pursuant to § 1191**

In the event that all requirements for confirmation are met except the provisions of § 1129(a)(8) of the Bankruptcy Code, Debtor requests that the Plan be confirmed pursuant to Section § 1191(b) of the Bankruptcy Code.

Dated: April 8, 2024

PONTOON BREWING COMPANY, LLC

/s/ Sean O'Keefe (by G. Frank Nason, IV with express permission)

LAMBERTH, CIFELLI,
 ELLIS & NASON, P.A.
*Counsel for Debtor*

By: */s/ G. Frank Nason, IV*
      G. Frank Nason, IV
      Georgia Bar No. 535160
      fnason@lcenlaw.com

6000 Lake Forest Drive, NW
Suite 435
Atlanta, Georgia 30328
(404) 262-7373

**Exhibit "A"**

**Existing Equity Holders**

| Name of Unitholder | Percent Outstanding | Percent Fully Diluted |
|---|---|---|
| Eric Lemus | 6.37% | 7.08% |
| Eddie Sarrine | 12.72% | 13.01% |
| Marcus Powers | 24.26% | 23.80% |
| Sean O'Keefe | 17.89% | 17.84% |
| Doug Knowling | 5.02% | 5.82% |
| Patrick O'Keefe | 1.52% | 1.42% |
| Earnest Hansley Sr. | 1.13% | 1.06% |
| Trip Huellender | 3.55% | 3.32% |
| Fairly Poplar Investments | 11.94% | 11.15% |
| Will Matthews | 2.12% | 1.98% |
| Marc Pelletier | 0.91% | 0.85% |
| [Gator Investments, LLC] | 2.95% | 2.75% |
| Beckett Horner | 1.15% | 1.08% |
| Earnest Hansley Jr. | 1.06% | 0.99% |
| Paul Hansley | 0.15% | 0.14% |
| Chris Baratz | 0.98% | 0.92% |
| Kris Kelleher | 0.00% | 0.92% |
| Davis Logan | 0.00% | 0.00% |
| Jason Erhlich | 0.70% | 0.66% |
| Jim Yoder | 0.42% | 0.39% |
| Debra R. Jacobs | 0.42% | 0.39% |
| Wyatt Engwall | 1.28% | 1.19% |
| Nich Rocha | 0.35% | 0.33% |
| Dean Greco | 0.28% | 0.26% |
| Gregory A Greco | 0.35% | 0.33% |
| Luke DiMaggio | 0.35% | 0.33% |
| Vivek Gautam | 0.70% | 0.66% |
| Curt Swilley | 0.35% | 0.33% |
| Jack Tousant (LLC) | 0.28% | 0.26% |
| John "Jack" Lang | 0.28% | 0.26% |
| Stephen Upchurch | 0.21% | 0.20% |
| Rober Simmerman | 0.30% | 0.28% |
| **Total** | 100.00% | 100.00% |

**Exhibit "B"**

**Dilution of Equity Holders by Equity Contribution**

| Name of Unitholder | Common Units (Equity Round 4 - $.75 per unit) | Total Common Units | Percent Prior | Percent Fully Diluted | +/- |
|---|---|---|---|---|---|
| Eric Lemus | - | 125,000.00 | 6.97% | 5.52% | -1.44% |
| Eddie Sarrine | 40,000.00 | 269,722.22 | 12.80% | 11.92% | -0.88% |
| Marcus Powers | - | 420,182.41 | 23.42% | 18.57% | -4.85% |
| Sean O'Keefe | - | 315,025.00 | 17.56% | 13.92% | -3.64% |
| Doug Knowling | 66,666.00 | 169,432.67 | 5.73% | 7.49% | 1.76% |
| Patrick O'Keefe | - | 25,000.00 | 1.39% | 1.10% | -0.29% |
| Earnest Hansley Sr. | 9,333.00 | 27,990.41 | 1.04% | 1.24% | 0.20% |
| Trip Huellender | - | 58,600.00 | 3.27% | 2.59% | -0.68% |
| Fairly Poplar Investments | - | 196,944.44 | 10.98% | 8.70% | -2.27% |
| Will Matthews | - | 35,000.00 | 1.95% | 1.55% | -0.40% |
| Marc Pelletier | - | 15,000.00 | 0.84% | 0.66% | -0.17% |
| [Gator Investments, LLC] | - | 48,640.00 | 2.71% | 2.15% | -0.56% |
| Beckett Horner | - | 19,000.00 | 1.06% | 0.84% | -0.22% |
| Earnest Hansley Jr. | - | 17,500.00 | 0.98% | 0.77% | -0.20% |
| Paul Hansley | - | 2,500.00 | 0.14% | 0.11% | -0.03% |
| Chris Baratz | - | 26,235.00 | 1.46% | 1.16% | -0.30% |
| Kris Kelleher | - | 16,235.00 | 0.90% | 0.72% | -0.19% |
| Tyler Weddle | - | 16,235.00 | 0.90% | 0.72% | -0.19% |
| Jason Erhlich | - | 11,574.07 | 0.65% | 0.51% | -0.13% |
| Jim Yoder | - | 6,944.44 | 0.39% | 0.31% | -0.08% |
| Debra R. Jacobs | - | 6,944.44 | 0.39% | 0.31% | -0.08% |
| Wyatt Engwall | - | 10,532.41 | 0.59% | 0.47% | -0.12% |
| Nich Rocha | - | 5,787.04 | 0.32% | 0.26% | -0.07% |
| Dean Greco | - | 4,629.63 | 0.26% | 0.20% | -0.05% |
| Gregory A Greco | - | 5,787.04 | 0.32% | 0.26% | -0.07% |
| Luke DiMaggio | - | 5,787.04 | 0.32% | 0.26% | -0.07% |
| Vivek Gautam | - | 11,574.07 | 0.65% | 0.51% | -0.13% |
| Curt Swilley | - | 5,787.04 | 0.32% | 0.26% | -0.07% |
| Jack Tousant (LLC) | - | 4,629.63 | 0.26% | 0.20% | -0.05% |
| John "Jack" Lang | - | 4,629.63 | 0.26% | 0.20% | -0.05% |
| Stephen Upchurch | - | 3,472.22 | 0.19% | 0.15% | -0.04% |
| Brett Williams | - | 2,314.81 | 0.13% | 0.10% | -0.03% |
| Steven Guitar | - | 10,532.41 | 0.59% | 0.47% | -0.12% |
| Robert Simmerman | - | 5,000.00 | 0.28% | 0.22% | -0.06% |
| Jonathan Cannon | 10,000.00 | 10,000.00 | 0.00% | 0.44% | 0.44% |
| Oliver Burns | 86,667.00 | 86,667.00 | 0.00% | 3.83% | 3.83% |
| Ken & Eiran | 53,333.00 | 53,333.00 | 0.00% | 2.36% | 2.36% |
| Brittany Mealor | 6,666.00 | 6,666.00 | 0.00% | 0.29% | 0.29% |
| BN&T | 140,000.00 | 140,000.00 | 0.00% | 6.19% | 6.19% |
| John Thomas III | 33,333.00 | 33,333.00 | 0.00% | 1.47% | 1.47% |
| Matthew Long | 22,550.00 | 22,550.00 | 0.00% | 1.00% | 1.00% |
| **Total** | 468,548.00 | 2,262,717.07 | 100.00% | 100.00% | - |
| Total Funds Raised | $    351,411.00 | | | | |

-

**Exhibit "C"**

**Projected Disposable Income**

| | December | January | February | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Starting Cash | $129,555.67 | $105,976.75 | $92,860.13 | $100,168.52 | $109,674.27 | $151,722.02 | $158,227.77 | $167,733.52 | $174,239.27 | $186,745.02 | $194,250.77 | $196,756.52 | $199,262.27 | |
| Taproom Revenue | – | 26,000.00 | 51,500.00 | 64,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 681,500.00 |
| Online Revenue | – | – | 2,000.00 | 10,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 57,000.00 |
| Event Revenue | – | – | – | – | 30,000.00 | 30,000.00 | 5,000.00 | 8,000.00 | 5,000.00 | 15,000.00 | 10,000.00 | 5,000.00 | 5,000.00 | 113,000.00 |
| Distribution Revenue | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Food Revenue | – | – | – | – | – | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 400,000.00 |
| Total Revenue | – | 26,000.00 | 53,500.00 | 74,000.00 | 95,000.00 | 145,000.00 | 120,000.00 | 123,000.00 | 120,000.00 | 130,000.00 | 125,000.00 | 120,000.00 | 120,000.00 | 1,251,500.00 |
| Beer COGS | – | – | – | – | – | 17,458.00 | 28,000.00 | 28,000.00 | 28,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 229,458.00 |
| Taproom COGS | – | 1,025.00 | 1,125.00 | 1,200.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 25,850.00 |
| Supplies | – | 2,000.00 | 2,000.00 | 2,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 33,000.00 |
| Utilities | – | 3,360.00 | 4,860.00 | 4,860.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 58,080.00 |
| Logistics | – | 1,800.00 | – | – | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 15,300.00 |
| Repairs | – | 5,500.00 | 2,500.00 | 2,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 24,000.00 |
| Equipment Rental | – | 768.00 | 1,368.00 | 1,368.00 | 1,368.00 | 1,368.00 | 1,368.00 | 1,368.00 | 1,368.00 | 1,368.00 | 1,368.00 | 1,368.00 | 1,368.00 | 15,816.00 |
| Other Fixed/Ins | – | 9,319.00 | 8,119.00 | 8,119.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 115,557.00 |
| Capital Exp | – | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 42,000.00 |
| Rent/Benl/Staff | – | 22,306.92 | 43,144.62 | 43,144.62 | 57,126.25 | 57,126.25 | 57,126.25 | 57,126.25 | 57,126.25 | 57,126.25 | 57,126.25 | 57,126.25 | 57,126.25 | 622,732.40 |
| Total Expenses | – | 49,578.92 | 66,616.62 | 66,691.62 | 85,494.25 | 102,952.25 | 113,494.25 | 113,494.25 | 113,494.25 | 117,494.25 | 117,494.25 | 117,494.25 | 117,494.25 | 1,181,793.40 |
| | – | (23,578.92) | (13,116.62) | 7,308.38 | 9,505.75 | 42,047.75 | 6,505.75 | 9,505.75 | 6,505.75 | 12,505.75 | 7,505.75 | 2,505.75 | 2,505.75 | |
| Priority Tax Claim | | | | | | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 11,328.00 |
| Secured Claim | | | | | | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 51,032.00 |
| **Net Profit** | | | | | | **34,252.75** | **(1,289.25)** | **1,710.75** | **(1,289.25)** | **4,710.75** | **(289.25)** | **(5,289.25)** | **(5,289.25)** | **27,228.00** |
| PDI | | | | | | | | | | | | | | 27,228.00 |

# Twelve Month PROFIT & LOSS PROJECTION

**Based on 4000 Barrels — YEAR 2**

*Based on Weighted Averages*

Barrel System: 10

| | TREND | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 | YEARLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES (SALES)** | | | | | | | | | | | | | | |
| Events | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Taproom Sales | | 18,000 | 73,000 | 58,000 | 53,000 | 82,000 | 48,000 | 54,000 | 18,000 | 78,000 | 58,000 | 12,000 | 35,000 | 232,500 |
| Take Home Sales | | 73,000 | 28,000 | 25,000 | 20,000 | 32,000 | 20,000 | 20,000 | 78,000 | 30,000 | 38,000 | 27,000 | 15,000 | 252,500 |
| Case Distribution | | 7,590 | 7,810 | 8,140 | 8,380 | 8,910 | 8,410 | 8,610 | 8,380 | 8,230 | 7,810 | 7,460 | 6,710 | 94,910 |
| Case COS | | 55,798 | 55,798 | 55,798 | 48,738 | 55,798 | 48,738 | 55,798 | 48,738 | 55,798 | 55,798 | 48,738 | 48,738 | 449,480 |
| 1/6 Keg COS | | 48,738 | 48,738 | 48,738 | 25,914 | 48,738 | 29,453 | 48,738 | 25,914 | 29,453 | 48,738 | 29,453 | 25,914 | 342,816 |
| 1/4 Keg COS | | 19,950 | 19,950 | 19,950 | 17,420 | 19,950 | 17,420 | 19,950 | 17,420 | 19,950 | 19,950 | 19,950 | 17,420 | 231,750 |
| 1/2 Keg COS | | 17,420 | 17,420 | 17,420 | 7,498 | 17,420 | 8,545 | 17,420 | 7,498 | 8,545 | 8,545 | 8,545 | 7,498 | 99,402 |
| Contract Brewing COS | | 8,545 | 8,545 | 8,545 | 3,239 | 8,545 | 3,239 | 8,545 | 3,239 | 3,239 | 3,600 | 3,239 | 3,239 | 42,114 |
| Contract Brewing | | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 34,775 |
| Food COS | | 6,160 | 6,160 | 6,160 | 5,540 | 6,160 | 6,160 | 6,160 | 5,540 | 6,160 | 6,160 | 6,160 | 5,540 | 72,060 |
| **TOTAL SALES** | | 124,998 | 200,718 | 183,048 | 145,278 | 214,818 | 148,598 | 174,488 | 154,278 | 207,938 | 182,718 | 138,388 | 138,408 | 2,055,670 |
| **TOTAL COST OF SALES** | | 52,856 | 64,465 | 62,147 | 55,487 | 66,944 | 59,916 | 60,528 | 54,185 | 65,634 | 62,021 | 55,009 | 51,268 | 710,439 |
| **Gross Profit** | | 72,142 | 134,532 | 120,901 | 101,790 | 147,874 | 104,461 | 113,159 | 102,093 | 142,304 | 120,696 | 83,379 | 87,140 | 1,345,231 |
| **EXPENSES** | | | | | | | | | | | | | | |
| Full Time Salary Expenses | | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 417,500 |
| Part Time Salary Expenses | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Payroll Expenses | | 4,433 | 4,433 | 4,433 | 4,433 | 4,433 | 4,433 | 4,433 | 4,433 | 4,433 | 4,433 | 4,433 | 4,433 | 56,417 |
| Commissions | | 3,771 | 6,800 | 6,093 | 5,536 | 7,364 | 5,515 | 5,751 | 5,174 | 11,536 | 6,080 | 4,441 | 4,461 | 67,743 |
| Supplies | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Repairs and Maintenance | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 18,000 |
| Advertising | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Car, Delivery and Travel | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 18,000 |
| Accounting and Legal | | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 9,600 |
| Rent | | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 204,000 |
| Phone/Internet | | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 9,600 |
| Utilities | | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 52,200 |
| Insurance/Licensing | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Taxes (Real estate, etc.) | | 5,315 | 10,994 | 9,669 | 9,102 | 12,052 | 8,385 | 9,027 | 8,427 | 11,536 | 9,444 | 6,319 | 7,087 | 107,756 |
| Interest | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 99,402 |
| Dues & Subscriptions | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Meals/Entertainment | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Benefits | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **TOTAL EXPENSES** | | 94,541 | 106,269 | 105,637 | 102,112 | 106,891 | 101,575 | 102,263 | 101,077 | 104,099 | 103,199 | 98,101 | 99,022 | 1,227,799 |
| **Net Profit** | | (24,419) | 30,783 | 15,264 | 7,678 | 40,983 | 7,104 | 11,706 | 1,015 | 38,204 | 17,497 | (14,723) | (11,863) | 117,432 |
| Priority Tax Claim | | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 16,992.00 |
| Secured Claim | | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 76,548.00 |
| **Net Profit** | | (32,214.42) | 23,187.87 | 7,468.88 | (117.16) | 33,188.06 | (489.22) | 3,911.32 | (4,779.55) | 28,407.32 | 9,702.23 | (22,517.70) | (19,657.61) | 23,892.12 |

**Bootlegger's BREWING**

# PROFIT & LOSS PROJECTION

**Twelve Month** — Based on **4000 Barrels** — **YEAR 3** — Barrel System **10**

*Based on Weighted Averages

| REVENUES (SALES) | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | YEARLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Events | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Taproom Sales | 20,000 | 75,000 | 60,000 | 55,000 | 85,000 | 50,000 | 55,000 | 18,000 | 80,000 | 60,000 | 12,000 | 35,000 | 635,000 |
| Take-Home Sales | 7,500 | 28,000 | 25,000 | 20,000 | 32,000 | 20,000 | 20,000 | 18,000 | 30,000 | 25,000 | 12,000 | 15,000 | 252,000 |
| Merch | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 72,000 |
| Cans | 55,798 | 55,798 | 55,798 | 55,798 | 55,798 | 55,798 | 55,798 | 55,798 | 55,798 | 55,798 | 55,798 | 55,798 | 669,576 |
| 1/6 Keg Distribution | 48,738 | 48,738 | 48,738 | 48,738 | 48,738 | 48,738 | 48,738 | 48,738 | 48,738 | 48,738 | 48,738 | 48,738 | 448,460 |
| 1/6 Keg | 17,400 | 17,400 | 17,400 | 17,400 | 17,400 | 17,400 | 17,400 | 17,400 | 17,400 | 17,400 | 17,400 | 17,400 | 231,750 |
| 1/2 Keg Distribution | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | |
| 1/2 Keg | 6,160 | 6,160 | 6,160 | 5,540 | 5,540 | 6,160 | 6,160 | 5,540 | 6,160 | 6,160 | 5,540 | 5,540 | 72,060 |
| Contract Brewing | | | | | | | | | | | | | |
| Food Sales | | | | | | | | | | | | | |
| **TOTAL SALES** | **125,408** | **200,908** | **182,908** | **162,698** | **214,908** | **167,908** | **172,908** | **155,698** | **207,908** | **182,908** | **139,908** | **137,698** | **2,051,740** |

| TOTAL COST OF SALES | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | YEARLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Event COS/Labor | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 33,000 |
| Tasting COS | 1,780 | 6,674 | 5,339 | 4,894 | 7,564 | 4,449 | 4,894 | 4,447 | 7,119 | 5,339 | 2,670 | 3,114 | 58,385 |
| Take-Home Sales COS | 3,746 | 3,746 | 3,746 | 3,239 | 3,239 | 3,138 | 3,138 | 2,794 | 3,838 | 3,338 | 2,478 | 2,454 | 37,195 |
| Cans COS | 29,453 | 29,453 | 29,453 | 25,914 | 29,453 | 29,453 | 29,453 | 29,453 | 29,453 | 29,453 | 29,453 | 29,453 | 342,816 |
| 1/6 Keg COS | 8,545 | 8,545 | 8,545 | 7,498 | 8,545 | 8,545 | 8,545 | 7,498 | 8,545 | 8,545 | 7,498 | 7,498 | 99,402 |
| 1/2 Keg COS | 3,600 | 3,600 | 3,600 | 3,239 | 3,600 | 3,600 | 3,600 | 3,239 | 3,600 | 3,600 | 3,239 | 3,239 | 42,114 |
| Contract Brewing COS | | | | | | | | | | | | | 67,787 |
| Food COS | | | | | | | | | | | | | |
| **TOTAL COST OF SALES** | **52,669** | **63,996** | **61,551** | **54,507** | **66,165** | **59,112** | **59,657** | **53,422** | **65,080** | **61,551** | **54,774** | **50,978** | **703,262** |
| **Gross Profit** | **72,738** | **136,912** | **121,356** | **108,191** | **148,743** | **108,795** | **113,250** | **102,275** | **142,827** | **121,356** | **86,134** | **84,720** | **1,348,498** |

| EXPENSES | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | YEARLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Admin Salary Expenses | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 417,500 |
| Prime Salary Expenses | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 63,000 |
| Payroll Expenses | 4,453 | 4,453 | 4,453 | 4,453 | 4,453 | 4,453 | 4,453 | 4,453 | 4,453 | 4,453 | 4,453 | 4,453 | 53,440 |
| Commissions | 3,788 | 6,808 | 6,088 | 5,432 | 7,348 | 5,488 | 5,488 | 5,152 | 7,088 | 6,088 | 4,348 | 4,432 | 67,787 |
| Supplies | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Repairs and Maintenance | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 18,600 |
| Advertising | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Car, Delivery and Travel | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| Accounting and Legal | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Phone/Internet | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 204,000 |
| Utilities | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 52,200 |
| Insurance/Licensing | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Taxes (Real estate, etc.) | 8,908 | 11,008 | 9,658 | 8,908 | 12,058 | 8,533 | 8,908 | 8,383 | 11,333 | 9,658 | 7,033 | 7,633 | 107,443 |
| Interest | 5,346 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 99,402 |
| Dues & Subscriptions | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Benefits | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Meals/Entertainment | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| **TOTAL EXPENSES** | **96,929** | **103,611** | **105,941** | **102,136** | **107,221** | **101,816** | **102,391** | **101,331** | **106,416** | **103,541** | **98,596** | **99,241** | **1,231,189** |
| **Net Profit** | **(23,990)** | **33,201** | **15,415** | **6,055** | **41,522** | **6,979** | **10,859** | **946** | **36,411** | **17,815** | **(13,462)** | **(12,541)** | **117,209** |

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | YEARLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Priority Tax Claim | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 16,992.00 |
| Secured Claim | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 6,379.00 | 76,548.00 |
| Net Profit | (31,783.34) | 25,505.85 | 7,620.21 | (1,740.04) | 33,726.56 | (815.44) | 3,064.43 | (6,850.42) | 28,616.20 | 10,020.21 | (21,257.04) | (20,336.04) | 23,768.87 |

# PROFIT & LOSS PROJECTION

**Twelve Month** — **Based on** **4000 Barrels** **YEAR 4** — **Barrel System** **10**

*Based on Weighted Averages

| | TREND | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 | YEARLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES (SALES)** | | | | | | | | | | | | | | |
| Events | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Taproom Sales | | 75,000 | 60,000 | 60,000 | 55,000 | 85,000 | 50,000 | 55,000 | 50,000 | 80,000 | 60,000 | 30,000 | 35,000 | 655,000 |
| Take Home Sales | | 20,000 | 28,000 | 25,000 | 20,000 | 32,000 | 20,000 | 20,000 | 18,000 | 30,000 | 25,000 | 12,000 | 15,000 | 252,500 |
| Merch | | 7,500 | 8,500 | 8,500 | 8,500 | 9,000 | 8,500 | 8,500 | 8,500 | 7,500 | 8,000 | 7,500 | 7,000 | 98,000 |
| Case Distribution | | 55,798 | 55,798 | 55,798 | 48,758 | 55,798 | 55,798 | 55,798 | 48,758 | 55,798 | 55,798 | 55,798 | 48,758 | 648,450 |
| 1/6 Keg Distribution | | 19,950 | 19,950 | 19,950 | 17,400 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 17,400 | 231,750 |
| 1/2 Keg Distribution | | 6,160 | 6,160 | 6,160 | 5,540 | 6,160 | 6,160 | 6,160 | 6,160 | 6,160 | 6,160 | 6,160 | 5,540 | 72,640 |
| Contract Brewing | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Food Sales | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **TOTAL SALES** | | **131,908** | **207,908** | **190,408** | **170,198** | **222,908** | **175,908** | **180,608** | **163,198** | **214,908** | **189,908** | **146,408** | **143,698** | **2,137,760** |
| **TOTAL COST OF SALES** | | | | | | | | | | | | | | |
| Event COS (Labor) | | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 33,000 |
| Tasting COS | | 1,780 | 6,674 | 5,339 | 4,894 | 7,364 | 4,449 | 4,894 | 4,497 | 7,119 | 5,339 | 2,670 | 3,114 | 58,085 |
| Take Home Sales COS | | 1,874 | 6,996 | 6,246 | 4,997 | 7,996 | 4,997 | 4,997 | 4,497 | 7,496 | 6,246 | 2,998 | 3,748 | 63,060 |
| Merch COS | | 2,850 | 3,040 | 3,230 | 3,230 | 3,420 | 3,420 | 3,420 | 3,420 | 2,850 | 3,040 | 2,660 | 2,660 | 37,240 |
| Case COS | | 29,453 | 29,453 | 29,453 | 25,914 | 29,453 | 29,453 | 29,453 | 25,914 | 29,453 | 29,453 | 29,453 | 25,914 | 342,816 |
| 1/6 Keg COS | | 8,545 | 8,545 | 8,545 | 7,498 | 8,545 | 8,545 | 8,545 | 7,498 | 8,545 | 8,545 | 8,545 | 7,498 | 99,427 |
| 1/2 Keg COS | | 3,600 | 3,600 | 3,600 | 3,299 | 3,600 | 3,600 | 3,600 | 3,299 | 3,600 | 3,600 | 3,600 | 3,299 | 42,114 |
| Contract Brewing | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Food COS | | 2,289 | 3,798 | 3,438 | 3,034 | 4,078 | 3,138 | 3,238 | 2,894 | 3,938 | 3,438 | 2,528 | 2,534 | 38,385 |
| **TOTAL COST OF SALES** | | **56,139** | **67,656** | **65,401** | **58,557** | **70,465** | **63,332** | **63,707** | **57,472** | **68,940** | **65,411** | **58,444** | **54,458** | **730,342** |
| **Gross Profit** | | **75,768** | **140,052** | **124,806** | **111,641** | **152,503** | **112,555** | **116,700** | **105,725** | **145,967** | **124,496** | **87,964** | **89,240** | **1,387,418** |
| **EXPENSES** | | | | | | | | | | | | | | |
| Salary Expenses | | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 417,500 |
| Hourly Salary Expenses | | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| Payroll Expenses | | 4,633 | 4,633 | 4,633 | 4,633 | 4,633 | 4,633 | 4,633 | 4,633 | 4,633 | 4,633 | 4,633 | 4,633 | 55,600 |
| Commissions | | 3,848 | 6,888 | 6,188 | 5,532 | 7,488 | 5,688 | 5,788 | 5,292 | 7,168 | 6,148 | 4,428 | 4,472 | 68,827 |
| Supplies | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Repairs and Maintenance | | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 19,800 |
| Advertising | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Car, Delivery and Travel | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Accounting and Legal | | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 9,600 |
| Rent | | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 204,000 |
| Phone/Internet | | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 9,600 |
| Utilities | | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 52,200 |
| Insurance/Licensing | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Taxes (Real estate, etc.) | | 5,468 | 11,138 | 9,846 | 9,796 | 12,283 | 8,798 | 9,794 | 8,571 | 11,483 | 9,838 | 6,544 | 7,136 | 109,413 |
| Interest | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Dues & Subscriptions | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Media/Entertainment | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Benefits | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **TOTAL EXPENSES** | | **100,131** | **108,871** | **109,259** | **105,453** | **110,596** | **105,191** | **105,709** | **104,648** | **109,676** | **104,801** | **101,799** | **102,404** | **1,270,539** |
| **Net Profit** | | **(24,342)** | **31,181** | **15,548** | **6,187** | **41,907** | **7,344** | **10,992** | **1,077** | **36,291** | **17,499** | **(13,835)** | **(13,164)** | **116,879** |
| Priority Tax Claim | | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 1,416.00 | 16,992.00 |

Eastern BREWING